# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-750

AVANTI EXPLORATION, LLC

VERSUS

KIMBERLY ROBINSON, SECRETARY, LOUISIANA DEPARTMENT OF REVENUE

**********
APPEAL FROM THE
BOARD OF TAX APPEAL 3RD
PARISH OF BOARD OF TAX APPEAL 3RD, NO. BTA9608D
HONORABLE ANTHONY JOHN GRAPHIA, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

Eulis Simien, Jr.
Roy Bergeron, Jr.
Simien & Simien, L.L.C.
7908 Wrenwood Boulevard
Baton Rouge, LA 70809
Telephone:  (225) 932-9221
COUNSEL FOR:
    Defendant/Appellant - Kimberly Robinson, Secretary, Louisiana Department of Revenue

James C. Exnicios
Cheryl Mollere Kornick
Randy J. Marse, Jr.
Liskow & Lewis, APLC
701 Poydras Street -  50th Floor
New Orleans, LA 70139
Telephone:  (504) 581-7979
COUNSEL FOR:
    Plaintiff/Appellee - Avanti Exploration, LLC

**THIBODEAUX, Chief Judge.**

In this tax case, the plaintiff taxpayer, Avanti Exploration, LLC (Avanti), disputes additional severance taxes assessed against it by the defendant, Kimberly Robinson, Secretary, Louisiana Department of Revenue (Department). Avanti filed a petition with the Board of Tax Appeals (Board). Both Avanti and the Department filed motions for summary judgment, and the Board found in favor of Avanti. The Department now appeals the Board's judgment granting summary judgment to Avanti. Following our de novo review, we find no issue of material fact and find that Avanti is entitled to summary judgment as a matter of law. We affirm the judgment of the trial court.

I.

**ISSUE**

We must decide whether the Board erred in applying La.R.S. 47:633(7)(a) and applicable law in granting summary judgment to Avanti.

II.

**FACTS AND PROCEDURAL HISTORY**

Avanti is engaged in the oil & gas production business in Louisiana, operating various wells and producing oil from mineral leases in Beauregard Parish. As a producer who severed the natural resource from the ground, Avanti was subject to the Louisiana oil severance tax levied under La.R.S. 47:633(7). The statute bases the tax on the value of the oil at the time and place of severance on the lease in the field. The severance tax is calculated on the producer's gross receipts on sales or by the posted field price, whichever is higher. However, if a

producer incurs transportation costs in getting his product to market, to a point of sale off the lease, he can subtract the transportation costs from his gross receipts and calculate the severance tax on the reduced amount.

Avanti sold the oil produced from the leases pursuant to contracts with buyers. The contracts obligated the initial buyer, the "first purchaser," to take title and delivery of the oil at the lease where production occurred. Therefore, Avanti did not have to transport its oil to market, or to a point of sale off the lease, and its severance tax payments should have been based upon its gross receipts, without any reduction/deduction for transportation costs.

At issue in this case are Avanti's contracts with two of its first purchasers, Phillips 66 Company (Phillips), and Cokinos Energy Corporation (Cokinos). Each contract contained a negotiated price formula to establish the sales price to be paid to Avanti for the oil it conveyed to the buyer at the lease each month during the term of the contract. The price formulas in Avanti's contracts with its buyers began with published, oil market center prices for the month of production and made various positive and negative adjustments to arrive at a lower price to be paid for the crude oil being sold at the lease.

Pursuant to the contracts and La.R.S. 47:638, the buyer was required to calculate, deduct, and withhold from Avanti's gross proceeds, the appropriate amount of severance tax due under La.R.S. 47:633 before remitting payment to Avanti, but the ultimate tax liability remained with Avanti under La.R.S. 47:637. After withholding the severance tax, the buyer would then file the necessary severance tax returns and remit the taxes to the Department. Following the payment of taxes on Avanti's behalf by its purchasers, Phillips and Cokinos, the Department performed an audit of Avanti's records and found that Avanti had

impermissibly reduced its gross receipts, and its tax computation, by subtracting transportation costs that were not allowed in its case since it sold its oil on the lease.

The Department issued a notice of assessment to Avanti for additional severance taxes for the tax period of January 1, 2012, through December 31, 2014. The total assessment was $119,463.67, which included taxes in the amount of $79,783.73, together with interest in the amount of $10,567.65 and penalties in the amount of $29,112.29. Except for specific amounts that Avanti admitted to owing because of well-classification errors and unfiled reports, Avanti disputed the additional severance tax and filed a petition for redetermination of the assessment. Subsequently, Avanti and the Department filed motions for summary judgment.

Following a hearing, the Board found in favor of Avanti, granting its motion for summary judgment while denying the Department's motion for summary judgment. The Department brought this appeal. For the following reasons, we affirm summary judgment in favor of Avanti.

III.

## STANDARD OF REVIEW

> Summary judgments are reviewed *de novo* on appeal, with the reviewing court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. La.Code Civ.P. art. 966.

*Smith v. Robinson*, 18-728, p. 5 (La. 12/5/18), __So.3d __.

3

## IV.

## LAW AND DISCUSSION

*Applicable Law*

Louisiana imposes a severance tax on oil and other natural resources as they are severed from the ground or water. Louisiana Constitution Article 7, § 4(B) (emphasis added) provides in pertinent part:

> Severance Tax. Taxes may be levied on natural resources severed from the soil or water, to be paid proportionately by the owners thereof at the time of severance. Natural resources may be classified for the purpose of taxation. Such taxes may be predicated upon either the quantity or value of the products *at the time and place of severance*.

Accordingly, the Legislature enacted La.R.S. 47:631, which states:

> Taxes as authorized by Article VII, Section 4 of the Constitution of Louisiana are hereby levied upon all natural resources severed from the soil or water, including all forms of timber, including pulp woods, turpentine, and other forest products; minerals such as oil, gas, natural gasoline, distillate, condensate, casinghead gasoline, sulphur, salt, coal, lignite, and ores; marble, stone, sand, shells, and other natural deposits; and the salt content in brine.

The severance tax on oil is based upon the *value* of the oil at the *time and place of severance*, which means on the mineral lease in the field. However, if the producer has to take the oil to market to perfect a sale, he can subtract that transport cost from the higher sales price he receives there in the distant market, and pay severance tax on the reduced amount. Louisiana Revised Statutes 47:633 (emphasis added) provides in pertinent part:

> The taxes on natural resources severed from the soil or water levied by R.S. 47:631 shall be predicated on the quantity or value of the products or resources severed and shall be paid at the following rates:

4

. . . .

(7)(a) On oil twelve and one-half percentum of its *value at the time and place of severance.* Such *value shall be the higher of* (1) the *gross receipts* received from the first purchaser, *less charges for trucking*, barging and pipeline fees, *or* (2) the *posted field price.* In the absence of an arms length transaction or a posted field price, the value shall be the severer's gross income from the property as determined by R.S. 47:158(C).

Pursuant to authority granted to it by La.R.S. 47:1511, the Department defines *value* and other terms from the statute in its own regulations:

Value—with respect to oil and/or condensate, the value shall be the higher of the gross receipts received from the first purchaser by the producer or the posted field price.

a. *Gross Receipts*—the total amount of payment:

i. received from the first purchaser in an arm's length transaction[.]

b. *Posted Field Price*—a statement of crude oil prices circulated among buyers and sellers of crude petroleum and is generally known by buyers and sellers within the field as being the posted price. The posted field price is the actual price of crude petroleum advertised for a field. The area price is a statement of crude oil prices circulated among buyers and sellers of crude petroleum listing prices for different areas of the state, usually listed as north Louisiana and south Louisiana, and generally known among buyers and sellers within the area as the posted price. This area price is the beginning price for crude petroleum of an area before adjustments for kind and quality (including, but not limited to, gravity adjustments) of the crude petroleum. When no actual posted field price is advertised or issued by a purchaser, the area price less adjustments for kind or quality (including, but not limited to, gravity adjustments) becomes the posted field price.

c. *Arm's Length Transaction*—a contract or agreement that has been arrived at in the open market place between independent and nonaffiliated parties with opposing economic interests.

. . . .

> e. *Value in Arm's Length Transaction*—in an arm's length transaction, the value shall be the gross receipts of all things of value received directly or indirectly by the producer.

> . . . .

> h. *Transportation Costs*—there shall be deducted from the value determined under the foregoing provisions the charges for trucking, barging, and pipeline fees actually charged the producer. In the event the producer transports the oil and/or condensate by his own facilities, $0.25 per barrel shall be deemed to be a reasonable charge for transportation and may be deducted from the value computed under the foregoing provisions. The producer can deduct either the $0.25 per barrel or actual transportation charges billed by third parties but not both. Should it become apparent the $0.25 per barrel charge is inequitable or unreasonable, the secretary may prospectively redetermine the transportation charge to be allowed when the producer transports the oil and/or condensate in his own facilities.

La.Admin.Code 61:1.2903(A)—Definitions.

In the present case, there was no traditional posted price in the field, which is apparently a practice that has been in disuse for many years. The Department did not enter evidence of a posted field price and asserts that it unquestionably did not use posted field price in calculating the tax deficiency. There was, however, an arm's length transaction, which is merely a contract "arrived at in the open market place between independent and nonaffiliated parties with opposing economic interests" instead of a contract between affiliated entities such as parent and subsidiary. *See* La.Admin.Code 61:I.2903(A). Thus, the Board found that Avanti's gross receipts, or the total amount of payments received pursuant to the contracts, determined the taxable value of the oil in the present case. La.R.S. 47:633(7)(a); La.Admin.Code 61:I.2903(A).

6

*The Contractual Pricing Formula*

The Department asserts that, instead of paying severance tax on its gross receipts, Avanti first reduced its receipts by the producer's transportation deduction in La.R.S. 47:633(7)(a) and La.Admin.Code 61:I.2903(A) and paid tax on the reduced amount. In support, the Department points to the price provisions in Avanti's buyer-seller contracts with Phillips and Cokinos.

The 2014 Phillips Contract provides (emphasis added):

3. PRICE

Phillips 66's West Texas Intermediate sweet crude, oil posted price deemed 40 degrees API gravity for pricing purposes, for the month of delivery plus the mean of the daily average of Platt's posting plus WTI prices quoted in Platt's Oilgram from the 26th of the month two months prior to the month of delivery through the 25th of the month one month prior to delivery (excluding weekends and holidays) plus/minus the mean of the Platt's daily average WTI Cushing versus Platt's daily average LLS differential for the same trading period *(-) $2.25 per barrel transportation differential.*

Similarly, the 2012 Cokinos contract appends a pricing exhibit that explains the above information in footnotes, stating that an average of three indices was used to determine price, minus a per barrel cost that is not defined. Under the heading of "Price Basis," the Cokinos contract provides (emphasis added) (footnotes omitted): "Phillips 66 WTI Posting plus Platts P.Plus plus Platts LLS *less $2.60/BBL.*"

The Department contends that the per barrel price reduction in each contract is, in effect, the transportation costs referenced in La.R.S. 47:633(7)(a) and La.Admin.Code 61:I.2903(h). The Department further asserts that such a "deduction" for transportation costs can only be taken by Avanti for costs it

7

actually incurred in transporting the oil to a point of sale and delivery *off of the lease*,[1] but that Avanti did not incur such costs.

### *Title and Delivery*

In support, the Department points to Avanti's arms-length contract provisions on title and delivery. Those provisions in essence state that the purchaser takes ownership of the oil *on the lease* in the field before the oil is transported away *by the purchaser*. The 2014 Phillips contract provides (emphasis added):

> 9. DELIVERY
>
> Title to all Production sold and delivered to Buyer shall pass from Seller to Buyer as such Production passes the *outlet flange of Seller's tankage on the lease* or leases from which such Production is being purchased. Buyer agrees to promptly take delivery of the Production upon availability from the Seller's tanks or through a pipeline. If Buyer takes delivery by a third party common carrier, Buyer shall immediately notify Seller of the carrier's name and address.

The 2012 Cokinos contract provides (emphasis added): "*Delivery:* Title and risk of loss shall pass from Seller to Buyer *as the crude oil exits the tankage of the respective lease and enters the trucks designated by Cokinos*."

While both contracts indicate that the oil is to be moved off the lease by the *purchaser*, the Department found that Avanti took the *producer's* transportation deduction by hiding it in the pricing formula. Thus, the Department asserts that, where Avanti incurred no transportation costs in order to sell its oil,

---

[1]The Department's legal support is its own 2008 Revenue Information Bulletin (RIB) 08-815, which defines "transportation" as a "substantial movement of oil by truck, barge or pipeline to a point of sale or delivery off the lease." The RIB defines "transportation costs" as "reasonable, actual costs incurred for moving the oil . . . to a point of sale or delivery off the lease[.]" By its own terms, the RIB does not have the force and effect of law and is not binding on the public or the Department.

which it sold right out of the tank on the lease, per the contracts, Avanti's taxable gross receipts cannot be reduced by the $2.25 and $2.60 per barrel shown in the respective contracts in order to pay lower taxes.

*Evidence of Gross Receipts*

Pursuant to our de novo review, the record reveals that Avanti paid severance taxes on the full amount of the funds it received, according to statute, and did not take a transportation deduction from these amounts before doing so. While the differential in the pricing formula and in various e-mails between Avanti and its purchasers is referred to as a "transportation differential," or a "truck deduct," there is no evidence that Avanti took the deduction allowed under La.R.S. 47:633(7)(a) and La.Admin.Code 61:I.2903(h) when the *producer* actually does incur transportation costs in getting his oil to market. To the extent that a *purchaser* incurred a trucking expense and this became an element of the negotiated price of the oil in an arm's length transaction, that amount appears as just another fluctuating overhead expense in the cost of doing business. The question is whether the *producer*, Avanti, took the deduction, and the record shows that it did not.

More specifically, the record contains check stubs showing payments from Phillips to Avanti, and from Cokinos to Avanti. In both instances, the purchasers withheld the severance taxes before remitting the remainder to Avanti, and the math indicates that the correct amount was withheld and remitted. For example, the December 19, 2013 check stub for the payment to Avanti in the total amount of $165,284.92 indicates that Avanti had a working interest ownership (coded "WI") in each of the eight property leases listed, and that the tax withheld

was a severance tax (coded "SV"; there are a total of eighteen tax codes listed in the legend). The price per barrel was $94.02 that month, for all eight of the listed leases, and the number of barrels and owner's gross value (gross sale) was shown for each lease. For example, on one of the leases, Avanti's gross sale was $40,920.55 (for production of 435 plus barrels of oil). From that amount, Cokinos withheld $5,115.06 in severance taxes. Since 12.5% of $40,920.55 is $5,115.06, the severance tax was calculated on the full and actual amount received by Avanti for the sale of its oil on that lease on that date.

The severance tax withheld on five of the eight leases was calculated at less than 12.5% (e.g., .031% or .062% or .082%) of the gross sale of oil from a particular lease, due to the well's classification and the statutorily reduced rate associated with that classification. For example, La.R.S. 47:633(7)(c)(iv) taxes formerly inactive or orphaned wells at ¼ or ½ of the 12.5% rate shown in Paragraph (7)(a). Likewise, the statute provides numerous other reductions or exemptions that may have resulted in lower severance tax rates on some of the listed leases. To the extent that any rates used were incorrect because of well-classification errors, Avanti agreed to pay those amounts early on in the litigation.

As to the gross receipts in the record, however, there is only evidence that severance taxes were paid on the full amount actually received for the oil, without any reduction or deduction for transportation costs. The Cokinos check stubs, with their extensive legends, have sixteen "Deduct Codes" for items such as "compression," "processing," "fuel," "upstream," "midstream," "gathering," "marketing," and two separate codes for "transportation." None of those codes were used to signal deductions, either before or after the severance tax was calculated on the full amount of the sale from the lease. We note that one deduct

10

code, "OR," was used, signaling a small oilfield site restoration fee[2] which amounted to $31.19 in total for all eight leases, all of which were subtracted from Avanti's payment only after the severance tax was calculated on the full amount of the sale.

Here, the Department essentially contends that Avanti and its purchasers conspired to manipulate Avanti's tax liability by taking a producer's transportation deduction and hiding it in the pricing formula. The evidence it placed in the record consists of selected statements made by John McIntyre, President of Avanti which, when considered in total, show confusion about why the Department disallowed a transportation deduction that the statutes appeared to allow. This confusion is understandable; the statutes, regulations, and contracts at issue are not exactly light reading and are quite soporific.

The Department also asserts that a Cokinos e-mail statement regarding a necessary increase in the "truck deduct" because of increased fuel, labor, and insurance costs, shows that a transportation cost was deducted *by Avanti*. However, the record in total indicates that this and other terms like "marketing adjustment" were all used to describe the elements of the pricing between Avanti and its purchasers. Whatever expenses the *purchaser* and its designated trucking company had, once they took possession of the oil and transported it to another point of sale down the road, do not affect the value of the oil when it was first severed from the ground, when that value was derived through arms-length transactions in the open market, and there is no posted field price.

---

[2]Louisiana Revised Statutes 30:87 imposes an oilfield site restoration fee on each barrel of oil produced in this state, ranging from 1.5 cents to 4.5 cents per barrel, to be deposited into the Oilfield Site Restoration Fund and used by the program for oilfield site restoration projects.

In a very similar case, the first circuit in *Robinson v. Mantle Oil & Gas, LLC*, 17-894 (La.App. 1 Cir. 3/29/10), 247 So.3d 738, *writ denied*, 18-852 (La. 9/28/18), 252 So.3d 922, found that the $1.80 per-barrel amount in the purchase agreement was not a post-sale deduction as asserted by the Department, and it could be used in the pricing formula to reduce the price of the oil:

> We find that the statute is clear and unambiguous, and it was properly applied in the manner that Mantle paid its tax. Mantle computed its severance taxes on the actual amounts it received from Central, *i.e.,* "the gross receipts received from the first purchaser." See LSA–R.S. 47:633(7)(a). The $1.80 per barrel amount in the purchase agreement is not a post-sale "deduction" as asserted by the Department. Rather, the contract price paid by Central to Mantle was a negotiated price between seller and purchaser, and, according to the price formula, the $1.80 per barrel amount is included in the calculations to determine the payment price due Mantle. Mantle sold its oil in the field at the well, and the cost of transportation was borne by Central. Mantle, as the seller, did not take any transportation deduction in the computation of its severance tax, as it did not transport the oil to the purchaser.
>
> Mantle properly computed its severance taxes on the actual amounts that it received from Central, i.e., "the gross receipts received from the first purchaser." Further, there is nothing to indicate that this was not an arms-length transaction. Accordingly, we find no genuine issue of material fact, and, under the plain language of the severance tax statute, the gross receipts received from Central equaled the amount actually paid pursuant to the purchase agreement. Mantle paid oil severance taxes based on the payments received from Central, and the Department's arguments regarding the Dugas & LeBlanc Well are without merit.

*Id.* at 744-45 (footnote omitted).

Here, the Department has not entered a single piece of evidence to show how it arrived at the figures upon which the Department valued the oil, except that it added back the per-barrel pricing differential that each contract had

subtracted to arrive at a negotiated price. Its attenuated argument that this add-on was proper because under its regulations, the pricing differential was a thing of value received by Avanti, is not supported or even logical, since Avanti suffered a price reduction pursuant to the differential. Avanti asserted that the Department used the large market center indices to calculate the severance tax, and this is a price that Avanti never received. The Department's response was only, no, that is not what it used. But it entered no evidence of any of its calculations into the record. If the Department added back the pricing differential to the market center indices that Avanti used in its contracts, which the Department admits, then the logical conclusion is that the Department did use the large market center indices to calculate the severance tax owed.

The court in *Mantle*, which also addressed a second well, the Roberts well, whose product was sold to a different purchaser, held that a market center price for a field 130 miles away could not be used as a posted field price, as asserted by the Department in that case, even though there was no written arms-length contract for the Roberts well. *Id.* There, again, the court held that, where there was no posted field price, Mantle's calculation of severance taxes based upon its gross receipts from the first purchaser pursuant to La.R.S. 47:633(7)(a) was correct. *Id.*[3]

---

[3]As to the Roberts well in *Mantle*, in the absence of a contract and a posted field price, the Department calculated a posted field price, pursuant to its definition in La.Admin.Code 61:I.2903(A), allegedly using an area price. The Department's area price was actually a market center index price from Louisiana's St. James Terminal. In rejecting the Department's calculations, the court articulated:

> The Department further argues that, even when there is adequate documentation of the price, the severance tax shall be calculated based on the higher of gross receipts or the posted field price. See LSA-R.S. 47:633(7)(a). It contends that since there was no specific field price for this field, the area price became the posted field price. In its audit, the Department identified Platts US Crude

13

Here, the Department argues that the Board should have stricken all of Avanti's references to market center prices, index prices, or posted field price because the Department did not use any of those prices in its calculations. We

> Wire-Oil index at LLS Oil Spot at St. James Terminal as the posted field price applicable to the Roberts Well and adjusted the reported value of the oil from the Roberts Well.
>
> Upon our review of the evidence in support of and in opposition to the motion for summary judgment, it is clear that there was no posted field price in the LeBlanc Field in Allen Parish where the Roberts well is located. However, rather than relying on the second option under LSA-R.S. 47:633(7)(a) for gross receipts . . . the Department chose instead to select another field approximately 130 miles from where the well was located to use as a posted field price, but only for those months that the St. James Field posted price was higher than the gross receipts. Although the Department acknowledges that the field price in St. James Parish is not an actual posted price in the LeBlanc Field, it argues instead that it is an "area price" that includes the LeBlanc Field and therefore became the "posted field price."

*Mantle*, 247 So.3d at 745.

After quoting the Department's definition of posted field price and area price in its regulation at La.Admin.Code 61:I.2903(A), the *Mantle* court found:

> The Department offered no evidence to show that any adjustments "for kind or quality (including, but not limited to, gravity adjustments)" were made to the area price to establish a posted field price. Further, according to the regulation, "the area price is the beginning price for crude petroleum of an area before adjustments ... of the crude petroleum." We find that the Department failed to establish the area field price less adjustments and, accordingly, failed to establish that the field price in St. James Parish was the actual posted price for the LeBlanc Field. Because there was no posted field price, Mantle calculated the value of the oil based on the "gross receipts received from the first purchaser" pursuant to LSA-R.S. 47:633(7)(a). We find no error in this determination.
>
> There being no genuine issues of material fact, the trial court correctly granted summary judgment in favor of Mantle. Mantle is entitled to a refund of the severance taxes paid under protest in the amount of $73,461.31.

*Id.* at 746 (alteration in original) (footnote omitted).

Conversely, in the present case, the Department has not admitted to using or calculating a posted field price but tries to create an issue of fact around what it might have been under La.Admin.Code 61:I.2903(A). We disagree. Where there was no evidence of a posted field price and the Department denies that it calculated one, we find no issue of material fact based upon the record.

must disagree. As stated, the Department admits that it added back the differential to the pricing formula, and the only other elements in Avanti's pricing formula were the market center indices. We find that Avanti's analysis of La.R.S.47:633(7)(a) with its discussion of "posted field price" was also an intertwined and integral part of its legal argument in its motion for summary judgment. This is because La.R.S. 47:633(7)(a) requires that *the higher of* either gross receipts *or* posted field price be used to calculate the severance tax. The Department states that it did not use a posted field price in this case, and the record reveals that there was no posted field price. Thus, Avanti's gross receipts are determinative of the severance tax.

Accordingly, Avanti has shown that it paid severance tax on the full amount of its gross receipts in sales to Cokinos and Phillips, and there are no material issues of fact or law preventing summary judgment in this case.

V.

## CONCLUSION

Based upon the foregoing, the judgment of the Board of Tax Appeals is affirmed. Costs in the amount of $2,143.00 are assessed against the defendant, Kimberly Robinson, Secretary, Louisiana Department of Revenue.

**AFFIRMED.**

15